# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 9, 2010

No. 09-10912

Lyle W. Cayce
Clerk

YVONNE DERRILL EWANS; CAMILLE LEWIS, Individually and as Next of Friend of Laurie Satchel; SARAVANAN RATHINASABAPATHY; NITHYA SARAVANAN,

> Plaintiffs - Appellants

v.

WELLS FARGO BANK, N.A.,

> Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:08-CV-1395

Before KING, HIGGINBOTHAM, and GARZA, Circuit Judges.

PER CURIAM:[*]

Yvonne Ewans, Camille Lewis, Lewis's minor daughter, Saravanan Rathinasabapathy, and Nithya Saravanan sued Wells Fargo Bank in state court under Texas tort law. Wells Fargo removed to the Northern District of Texas and won summary judgment on all claims. The plaintiffs appealed. Our review is de novo, applying the same standards as the district court and viewing the evidence in the light most favorable to Ewans, Lewis, the infant, Saravanan, and

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-10912

Nithya,[1] and we may affirm for any grounds supported by the record.[2]  After reviewing the parties' submissions and the summary judgment record, we cannot but agree that the district court came to the right conclusion.

I.

A.

Cindy Pirrello worked as a teller at a Wells Fargo branch in Frisco, Texas, and at 1:30 in the afternoon on Saturday, September 8, 2007 she had a half-hour left before closing time.  That is when she watched two men walk in whom she had never seen before.  As they sat down together at loan officer Matt Palmer's desk, Pirrello for a second noticed what looked like a gun handle on one man's right hip, but – before she could get a better look – he had pulled his shirt down over his waistband.

Pirrello told her shift supervisor, Sonia Alonzo, that one of the men might have a gun.  Alonzo told Pirrello not to be crazy and went back to her work.  Pirrello could not brush it off so easily, remembering that bank employees had been asked to keep an eye out for suspicious activity; an unknown assailant recently had gotten away after robbing a nearby Wells Fargo.  Plus, a technician named John Rooney was performing maintenance on the vault, leaving the bank's security compromised.

Pirrello relayed her concern to another banker, Chris Maiwald, whose desk sat adjacent to Palmer's.  Maiwald verified the holster on the man's hip, but – because of the pulled-down shirt – could not tell if it housed a gun. Maiwald also

---

[1]*Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 377 (5th Cir. 2010).

[2]*Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 754 (5th Cir. 2010).

noticed the men acting strangely, particularly the man with the bulge under his shirt.  He kept getting up, talking on his cell phone, pacing around, and looking out the windows.  Then Maiwald saw an SUV parked out front.  It had tinted windows and the ignition running.  One door was wide open.  Maiwald walked back into the vault to ask Rooney, the technician, if he owned the SUV; he did not.

Pirrello and Maiwald asked a fourth employee, Kathryn Zlotnik, for her take on the suspicious man.  Zlotnik had thought nothing of him, until she, too, noticed his pacing, looking out the front door, and bulge in the shape of a gun handle under his shirt – plus the unattributable SUV continuing to idle in front of the bank.

Maiwald, a former sheriff's deputy in Randall County, Texas, agreed they had to play it safe, that they should call for backup to investigate.  After making a group decision – but without seeking permission from Alonzo, the supervisor – Pirrello tripped the silent alarm.  Wells Fargo's private security center called the branch to see what was going on – to make sure it was not a false alarm.  Pirrello answered and explained right off the bat "we're not robbed."  She went on to say there were "two males sitting at one of our personal desks" and "we have a possibility that he has a gun on his hip, and his car is parked right outside the door and they've been on the phone since they got here."  Pirrello added "our vault [is] wide open because we had a problem last night."

The private security operator told Pirrello to call 911.  Once on the phone with the 911 dispatcher, Pirrello stated that she had been instructed by the private security center to call 911 because "two males [] walked into our branch, possibility of a gun in his pocket."  Maiwald then took over the call:

No. 09-10912

**Mr. Maiwald**: If we could, could we have a police officer, not in uniform preferably?

**911 Operator**: We don't have anybody not in uniform.

**Mr. Maiwald**: Really?

**911 Operator**: Right.

**Mr. Maiwald**: Okay.  Well, do you have somebody – do you guys still do drive-bys?

**911 Operator**: Actually, they're coming out because the female told me – who I was speaking to earlier thought that they had a gun in their pocket.

**Mr. Maiwald**: Okay.

**911 Operator**: They're coming now on a robbery.

**Mr. Maiwald**: Anyways.  (Laughter)  You might want to – you might want to stop that.  It's not a robbery in progress.

**911 Operator**: Okay, sir.  We have one officer that's there right now.  What is actually going on there, then?

**Mr. Maiwald**: Nothing.  We – we're talking to him about his loan that he's doing and everything else, and one of our tellers thought that he had a weapon on him, which she – she had believed it was a weapon.  I've looked at him.  I have a little bit of law enforcement experience.  I looked at him and it didn't look like he had a weapon on him because he did pull up his shirt a little bit and I couldn't see it in his pocket.  Send a police officer if you want to to come in and have a presence here, that might deter anything.

**911 Operator**: Sir, why are – what are you needing us for? I mean, he obviously did something that you need us there for.

No. 09-10912

**Mr. Maiwald**: One of our tellers thought he had a weapon.

**911 Operator**: Okay.

**Mr. Maiwald**: So that's why.

**911 Operator**: Okay. And you don't think he does?

**Mr. Maiwald**: Yeah, it was his suspiciousness.

**911 Operator**: Okay.

**Mr. Maiwald**: Very suspicious. So – you know, and I apologize for this, but that said, probably what we need is maybe just the officer to either, you know, walk in and say hi to everybody or just stay in his car out front. I don't know what your procedure is on that.

The police did not just send one officer to investigate. They sent in no fewer than ten officers. They set up a perimeter, and the SUV – the getaway car – started to drive off. The police stopped it and ordered the driver to call the man inside the bank, the one with the bulge. Once the police had the man on the phone, they ordered him out of the bank – had him crawl out the front door on his hands and knees. After subduing him, the police stormed the bank and captured the other man.

B.

Nobody had a gun. Neither man had any nefarious intentions. To the contrary, both are hard-working and law-abiding. The man with the hip holster was Ewans, and the holster was for his phone. He had just sold his car to the other man, Saravanan. Ewans's girlfriend, Lewis, had given them a ride to Wells Fargo to secure a car loan. Lewis, who drove the tinted SUV, had her

No. 09-10912

young daughter in the car – which is why she left it running and kept a door open while waiting in front of the bank.  Ewans and Saravanan were not casing the joint.  Far from it, they kept making calls and walking around because they did not have the proper documents: Saravanan called his wife, Nithya, who arrived with a paystub sometime after the bankers had already tripped the alarm; and Ewans made calls to retrieve the car title.

If only the siege ended their troubles.  Instead, a passerby taped the episode on his videophone and uploaded it onto YouTube.  Television and print news media ran with the story.  An alleged racial subtext made matters even worse: Pirrello is white, and her suspicious men were not. (Ewans is black, and Saravanan is Indian.)

Ewans, Lewis, Lewis's daughter, Saravanan, and Nithya filed suit against Wells Fargo in Texas state court for negligence, gross negligence, and false imprisonment.[3]  Wells Fargo removed to federal court, and in April 2009 filed a motion for summary judgment, which the district court granted in full.  Ewans and the rest filed a motion for reconsideration under Federal Rule of Civil Procedure 59(e), which the district court denied.  The plaintiffs appealed. Texas law governs in this diversity case.

## II.

### A.

The district court found that Ewans[4] could not prove Wells Fargo to be

---

[3]They also sued for assault, defamation, invasion of privacy, and intentional infliction of emotional distress, all of which have fallen out of the case.

[4]We use Ewans as a stand-in for all the plaintiffs.

No. 09-10912

negligent. On appeal he urges two errors: (1) the district court engaged in a subjective – instead of objective – inquiry into the bankers' reasonableness; and (2) the court ignored his negligent training claim.

i.

Even if the district court used a subjective test, our independent review of the record shows that Ewans's negligence claims must fail under an objective standard. Nobody can argue that the plaintiffs – and particularly Ewans – suffered great embarrassment. But just because somebody has been hurt does not mean that the law will find fault. Indeed, harm is but a fraction of the test. For the plaintiffs to recover, they must show that Wells Fargo (1) owed them a duty of care, (2) which it breached, (3) which in turn caused their damages.[5] The focus here is on prong two, whether Wells Fargo lived up to its duty of care – whether its employees acted like the reasonable person would.

After Wells Fargo moved for summary judgement, the plaintiffs failed to point to evidence establishing a genuine issue of material fact that the bank employees acted unreasonably under the circumstances. Ewans suggests that the bank's suspicion was not reasonable, because it all turned on one employee's – Pirrello's – irrational fears. The record does not support this characterization. In fact, three out of the four bank employees privy to the bulging shirt held the suspicion (Pirrello, Maiwald, and Zlotnik). Without adducing specific facts to counter Wells Fargo's compelling summary judgment motion, the plaintiffs must

---

[5]*See D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002). "Negligence is no more than breach of a legal duty; the tort becomes actionable when the breach causes injury." *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 536 (Tex. 1975).

## No. 09-10912

lose,[6] but, even putting these procedural concerns to one side, the record would not allow a reasonable jury to find the employees' actions unreasonable under the circumstances.

Pirrello, Maiwald, and Zlotnik knew that a different Wells Fargo had recently been robbed. Their vault was exposed. Two men, not regular customers of the bank, walked in near closing time and would not sit still. They kept talking on their phones, pacing, looking around the bank, and searching out the windows. One employee saw what might have been a gun, and the other employees acknowledged a bulge of some kind hidden under one man's shirt. Worse, an unknown SUV was parked – running, with a door open – immediately in front of the bank. The employees did not know if the men were casing the joint. They did not know if the car was a getaway car. Under these circumstances, it was reasonable to want to call for an investigatory backup. When they did, the employees told the 911 operator that there was no robbery and specifically asked for just one police officer either to stay outside in his car or to do a walk-through.

### ii.

On appeal Ewans argues that the crux of his case is not necessarily that the employees acted negligently by sounding the alarm, but that Wells Fargo negligently trained the employees on how to respond to suspicion – that Wells Fargo was negligent directly, not vicariously. This comes too late. In the district court, Wells Fargo moved for summary judgment on the negligent training claim, urging that it was nothing more than a second swing at ordinary

---

[6] *See Bustos v. Martini Club, Inc.*, 599 F.3d 458, 468 (5th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 324 (1986); *Hibernia Nat'l Bank v. Administracion Central Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985)).

No. 09-10912

negligence on the part of the employees.  In response, Ewans merely said negligent training was the "fulcrum" of his claim, but did not explain any more. We agree with the district court that Ewans did not identify sufficient evidence as to the negligent training claim to raise a genuine issue of material fact.

Even ignoring this dispositive procedural flaw, Ewans's claim must fail. Ewans analogizes to just one case – *Mackey v. U.P. Enterprises, Inc.*[7] – to try to establish negligent training of employees.  But the case holds that negligent training will lie only where "the complainant's injuries are the result of the employer's failure to take reasonable precautions to protect the complainant from *misconduct* of its employees."[8]  Ewans has not shown the employees here to have engaged in misconduct, to have breached a duty of care, so employer liability does not fit.

## B.

Because Ewans loses on his ordinary negligence claims, he must also lose on his gross negligence claim.[9]

## C.

Ewans brought a false imprisonment claim, the essential elements of which are: (1) willful detention; (2) without consent; and (3) without authority of law.[10]  Wells Fargo did not arrest or detain Ewans, "[b]ut in Texas . . . liability

---

[7]935 S.W.2d 446 (Tex. App. – Tyler 1996, no writ).

[8]*Id*. at 459 (emphasis added).

[9]*Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex. 1994) ("[T]he defendant's conduct must involve an 'extreme degree of risk,' a threshold significantly higher than the objective 'reasonable person' test for negligence.").

[10]*Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002).

No. 09-10912

for false imprisonment extends beyond those who willfully participate in detaining the complaining party to those who request or direct the detention. False imprisonment's first element may thus be satisfied by conduct that is intended to cause one to be detained, and in fact causes the detention, even when the actor does not participate in the detention."[11]

For Ewans to prove that Wells Fargo "instigat[ed]" his arrest, he must show that the bank "clearly directed or requested the arrest," that the officers arrested not through their "own volition, but to carry out the request of the defendant."[12]   The record, viewed in a light most favorable to Ewans, bears no such interpretation. As explained by the district court, the employees requested at most an investigatory walk-through, not an arrest or detention. Ewans with good reason concedes in his reply brief that no Texas case supports the imposition of liability here, and his citation to an intermediate Arizona court is unpersuasive for any number of reasons.[13]   Finally, his suggestion that Wells

---

[11]*Id.* at 507.

[12]*Id.* (quotation marks omitted); *see also Armstead v. Escobedo*, 488 F.2d 509, 511 (5th Cir. 1974) ("Under Texas law a private citizen does not incur liability simply because he mistakenly informs the police that the suspect has committed a crime whenever the suspect is not thereafter successfully prosecuted. Rather, the citizen must actually *direct* the police to make the arrest." (citations omitted) (emphasis in original)). "In *Armstead v. Escobedo*, a bus driver had a dispute with a female passenger over the fare. As she left the bus, she allegedly threatened the bus driver with a knife and threw a brick through the bus window. One week later, the same bus driver picked up a female passenger whom he believed to be his assailant. After questioning the passenger, he flagged down two passing police officers and told them that the female passenger was his assailant. The police officers decided to arrest the woman. She was later released after passing a lie detector test. She then sued the bus driver for false arrest. This Court held that the bus driver could not be held liable for false arrest because he had not directed the police to arrest the woman." *Halbert v. City of Sherman, Tex.*, 33 F.3d 526, 528 (5th Cir. 1994).

[13]*See Deadman v. Valley Nat'l Bank*, 743 P.2d 961 (Ariz. Ct. App. 1987). The court in that case explained that, unlike here, the record showed the employees did more than just

No. 09-10912

Fargo "knowingly provide[d] false information resulting in the arrest"[14] is without basis. Although Pirrello did mention to the 911 operator that the suspicious men would not take off their sunglasses – when they did not have on sunglasses – the district court rightly found this fact immaterial. Ewans points to nothing in the record to show that Pirrello "knowingly" provided false information or that the police in any way decided to detain Ewans because he might be wearing sunglasses. Instead, Ewans's own position is that the police decided to detain him as soon as they heard there might be a gun.

### D.

We conclude by addressing Ewans's motion for reconsideration, specifically his attempt to introduce new evidence, which includes testimony from the police that they based their tactical decisions on the information received from dispatch and an expert's opinion that industry best practices involve calling a non-emergency police number to investigate suspicions. A Rule 59(e) motion – which asks the court to set aside its previous judgment – "serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence. Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly."[15] Here, because "the district court refuse[d] to consider the [new] materials, the reviewing court

---

request an investigation. *See id.* at 969. The court, too, seemed to base false imprisonment in negligence, *see id.* at 970–71, but the Supreme Court of Texas has admonished that "false imprisonment is an intentional tort, requiring a willful detention by the defendant." *Wal-Mart Stores, Inc.*, 92 S.W.3d at 511.

[14] *Wal-Mart Stores, Inc.*, 92 S.W.3d at 509.

[15] *Templet v. Hydrochem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (citations and quotation marks omitted).

No. 09-10912

applies the abuse of discretion standard.  Under this standard of review, the district court's decision and decision-making process need only be reasonable."[16] That said, Ewans loses under any standard of review.

Circuit precedent requires us to look to: (1) the reasons for Ewans's default; (2) the importance of the omitted evidence to his case; (3) whether the evidence was available to him before he responded to the summary judgment motion; and (4) the likelihood that Wells Fargo will suffer unfair prejudice if the case is reopened.[17]  As explained by the district court, Ewans has never provided a convincing excuse for presenting his evidence only after the district court granted summary judgment.  More importantly, the new evidence adds nothing to Ewans's case.[18]  Just like the district court, our holding is unaffected by either side's testimony of "best practices."  Negligence law is concerned with reasonable practices, not best practices.  In conceding it is a "best" practice to call a non-emergency number to request police investigation, Ewans actually hurts his case – by adding to the reasonableness of calling the police in the first instance to report suspicion.  That the 911 dispatcher did not relay the non-emergency nature of the call to the responding police units is not a responsibility the bank must bear.

---

[16]*Id.* at 477 (citations omitted).

[17]*Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 174 (5th Cir. 1990), *overruled on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) (en banc).

[18]In fact, the evidence hurts Ewans's case.  For example, Sergeant Rowdy Ray Vest of the Frisco Police Department testified: "We don't live in a perfect world, so therefore, you know, if it's someone's perception that someone is carrying a gun or whatnot, it needs to be reported to us and we'll respond accordingly."  He also explained that he would not necessarily want bank personnel to be aware of the police department's emergency response procedures.

No. 09-10912

III.

Everybody involved likely wishes September 8, 2007 had never happened, or, at least, that it had not happened as it did. In a perfect world, Saravanan gets his loan and Ewans sells his car; Pirrello routinely closes the bank and the police patrol without incident; everyone goes home to enjoy a North Texas Saturday night. But tort law does not require the optimal outcome, just reasonable behavior – and will not here compensate Ewans, even though he innocently suffered. Doing so would punish ordinarily prudent bankers, bankers who might then be deterred from sounding the alarm in dangerous situations. When it comes to security, the law requires us to accept reasonable false positives in order to avoid the more catastrophic false negatives.

AFFIRMED.